UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ROBERT J. MADDAUS,

                Petitioner,

    v.

JERI BOE,

                Respondent.

CASE NO. 3:17-cv-06020-TSZ-GJL

REPORT AND RECOMMENDATION

NOTING DATE: **July 16, 2024**

    The District Court has referred this federal habeas action filed pursuant to 28 U.S.C. § 2254 to United States Magistrate Judge Grady J. Leupold. Petitioner Robert J. Maddaus filed a federal habeas petition ("Second Amended Petition"), seeking federal habeas relief from a state-court conviction. Dkt. 76. Upon review, the undersigned finds the Second Amended Petition is without merit and therefore recommends the Second Amended Petition be **DENIED** and this action be **DISMISSED with prejudice**.

## I.      BACKGROUND

    Petitioner is currently incarcerated at Eastern Oregon Correctional Institution and is serving a prison sentence of life without parole arising out of a jury conviction for felony

1  murder, attempted kidnapping in the first degree, assault in the second degree, unlawful

2  possession of a firearm (two counts), and tampering with a witness (three counts) before the

3  Superior Court of Washington for Thurston County ("Trial Court"). Dkt. 77-1 at 1–12, Ex. 1; *see*

4  *also* Dkt. 77-1 at 34, Ex. 2 (vacating one additional count of witness tampering).

5  **A.    Factual Background**

6  The Court of Appeals of the State of Washington ("State Court of Appeals") summarized

7  the facts of Petitioner's case and trial as follows:

8  ### I. CRIMES

9  ### A. First Degree Murder; Second Degree Assault

10  In the evening of November 13, 2009, Jessica Abear was sleeping in Maddaus's
   residence when a group of three to four persons kicked down the door and entered.
11  One of the intruders ordered Abear to "[f]reeze" and held a gun to her head. The
   intruders stole roughly $140,000 in drugs and cash.
12

13  When he returned home and learned about the robbery, Maddaus appeared "in a
   rage" and suspected that Abear had been involved. Attempting to elicit a
14  confession, he hit her on the head with the butt of a firearm, sprayed her three times
   with mace, ripped off her clothes, and shot her ten times with a paintball gun.
15  Maddaus then pointed the firearm at Abear's foot and threatened to shoot; but when
   he pulled the trigger, the firearm did not discharge. Abear told Maddaus that she
16  thought his drug supplier might be a suspect in the robbery. Maddaus called his
   supplier, relayed what Abear had said, and mentioned that he (Maddaus) needed to
17  "find someplace for [Abear] to go so that they [(Maddaus and his supplier)] could
   get the information out of [her]" and that he (Maddaus) "was going to torture it out
18  of [her]." Abear managed to run out and take shelter in a neighbor's house until she
   was able to leave safely.
19

20  The next day, Maddaus discovered a tape recording that contained a recorded phone
   conversation of the persons involved in the robbery. Although most of the voices
21  were unrecognizable, Maddaus believed that one was Shaun Peterson. Late the next
   evening, November 15, Maddaus met with Peterson and several friends (Matthew
22  Tremblay, Jesse Rivera, Daniel Leville, and Falyn Grimes) to question Peterson
   about his involvement in the robbery. Peterson was handcuffed, and Maddaus was
23  armed with a firearm and a knife. Nobody else was armed. While questioning
24

REPORT AND RECOMMENDATION - 2

Peterson, Maddaus played the recorded phone conversation. Peterson eventually walked out the front door; Maddaus followed him outside, after which Maddaus's friends reported hearing five rapid gunshots. Immediately following the shots, Matthew Tremblay saw Maddaus standing outside, pointing a firearm at Peterson, who ran a short distance before collapsing on the ground.

Early the following morning, November 16, Olympia police responded to a report of gunshots. They found Peterson on his back, having bled to death from multiple gunshot wounds. Police found four empty bullet casings and a cell phone near Peterson's body. The cell phone began to ring; the caller identified herself as Randi Henn, Peterson's girlfriend. Henn told the police that Peterson was involved in selling methamphetamine, that his drug source was Maddaus, and that Maddaus had recently been robbed and had asked to meet Peterson that night.

Several days later, police arrested Tremblay, who was believed to have been involved or to have knowledge about Peterson's murder. Tremblay told the police that (1) as he was placing items into Maddaus's vehicle, he had seen Peterson speaking with Maddaus outside the house and they had begun to argue; (2) Maddaus fired roughly five rounds from a firearm; (3) as the firing stopped, Tremblay looked up and saw Maddaus pointing a smoking firearm at Peterson; (4) Tremblay and Maddaus fled to Josephine Lundy's residence, where they unloaded items into a large metal shipping container; and (5) Tremblay did not know what happened to the firearm that Maddaus had used to kill Peterson.

Tremblay later took the police to Lundy's property, where Lundy consented to a search of her residence and property; nothing of evidentiary value was found. Lundy also confirmed many of the details that Tremblay had provided, including that Maddaus had contacted Lundy in the early morning on the 16th of November. Emerald Akau, who had been recently dating Maddaus, also spoke with police. She confirmed Maddaus's home address and stated that she had spent the night with him at his residence on the evening of November 16, the night after the murder.

The police obtained a search warrant for Maddaus's residence based on the information obtained during their investigation. This warrant authorized the police to search for: "[A]ny firearms, to include handguns, packaging for handguns, spent casings, new bullets, packaging for bullets," any "paintball guns, paintballs, marbles or items associated with paintball guns," and "handcuffs." Executing the warrant, police found a paintball gun, a handgun and ammunition, and a set of handcuffs. They also detected the faint odor of pepper spray.

Meanwhile, Maddaus had acquired a wig and a false passport bearing the name "Chad Walker Vogt". The police found a blonde wig in Maddaus's vehicle when they arrested him. When asked why he had a blonde wig, he stated, "Because I knew there was a warrant out for my arrest. The police wanted to talk to me. I didn't want to talk to them."

### B. Witness Tampering

Theodore Farmer had worked with Maddaus selling methamphetamine. After Farmer was caught carrying methamphetamine in November 2009, he provided Maddaus's name to the Thurston County Drug Task Force, became an informant, and agreed to perform three controlled buys from Maddaus. On November 14 or 15, Farmer called Maddaus to purchase methamphetamine, but Maddaus did not answer. Maddaus called Farmer back later and stated, "I can't talk. I'll either be— I'll talk to you in person, or either that, or I'll be in jail."

While awaiting trial in jail, Maddaus repeatedly telephoned his niece Chelsea Williams, Grimes, Leville, and Farmer, whom he called three times, to establish a false alibi. The jail actively monitored these calls. During a three-way phone call with Williams and Farmer, Maddaus stated, "Here's the deal, right? These F* * *ing phones are recorded all the way." Although Farmer initially agreed with Maddaus to provide false testimony, Farmer later changed his mind and contacted the police.

### II. PROCEDURE

The State charged Maddaus with first degree murder (alleging both premeditation and felony murder), first degree attempted kidnapping, second degree assault of Abear (assault with a deadly weapon), and four counts of witness tampering (two based on his contacts with Farmer from the jail). The first degree murder, attempted kidnapping, and assault charges each carried a sentencing enhancement allegation that "[Maddaus] was armed with a deadly weapon, a firearm."

### A. Pretrial Motions

\*     \*     \*

### B. Trial

### 1. Restraints

Over defense counsel's objection and without articulating its reasons, the trial court ordered Maddaus to wear a shock device and a leg restraint during trial. Before the jury entered, Maddaus's counsel told the trial court he was concerned that the jury

would notice the leg restraint if Maddaus were asked to walk to the witness stand in the jury's presence. In response, the trial court allowed Maddaus to take the stand before the jury entered.

The next day, Maddaus's counsel again notified the court that Maddaus was wearing a shock device and that he was concerned that the jury might notice it. In response, the court arranged several tables to block the jurors' views of the shock device. Maddaus's counsel agreed with this arrangement and acknowledged that the jurors would not see his shock device.

The next week, Maddaus's counsel again notified the court that he believed the jurors could see the device on Maddaus's leg because he was "wearing more constrictive pants." The trial court placed several pieces of cardboard around Maddaus's table, which "look[ed] like exhibits," to block the jurors' views. Maddaus's counsel again agreed with this arrangement and acknowledged that the jurors would not see Maddaus's restraints.

\*   \*   \*

**5. Closing arguments**

During closing, the State argued:

> [Y]ou can consider the reasonableness of the witness's statements in the context of the other evidence. Consider, for example, Mr. Maddaus's testimony that he—what did he say? He asked to put the handcuffs on Mr. Peterson? And Peterson did? I mean, *that's poppycock.* That's *unreasonable under the law. That's crazy.* Nobody voluntarily puts handcuffs on themselves, and besides, we have evidence, of course, that Mr. Peterson was literally under the gun at the time the cuffs were put on him.
>
> [ ... ]
>
> [C]ounsel for the accused argued that they—they worked hard, [Defense Counsel] worked real hard at finding witnesses. The evidence, however, ladies and gentlemen, the evidence about the defense witnesses suggests otherwise…. I'm not suggesting Mr. Wilson of wrongdoing; I'm just suggesting that [Defense Counsel], like Chelsea Williams, *was duped into being this defendant's agent.* "I've got somebody that's got this information." "Oh, we'll go talk to that person."
>
> [ ... ]

> Counsel for the accused's argument was a reminder of the distractions that sometimes people create when they're passengers in a vehicle. You're driving down the highway, and you're [focused] on paying attention to what's going on in front of you and keeping your eye on the rear-view mirror, and someone says, "Look over there. Look over there." That's what the argument was about. It was all about everything but the proof of Mr. Maddaus's guilt.
>
> [ ... ]
>
> What you heard in the defense case, those witnesses from the defense in the defense argument, was the last gasp of this defendant, the last gasp, *the last effort to develop lies to try to convince you of what he's not, that he's innocent, and he's not.* The last gasp.

Maddaus did not object to any of these statements.

The State also presented Microsoft PowerPoint slides during its closing argument including several slides depicting photographic exhibits with text superimposed. One slide depicted Maddaus wearing the wig that detectives had recovered from his vehicle. Surrounding the photo were capitalized captions describing various evidence used by the State, including: "JAIL PHONE CALLS," "FALSE ALIBI ATTEMPT," DISGUISE AND *COVER–UP*," "FUGITIVE," THREATS TO KILL," "MOTIVE," "TELEPHONE RECORDS," and "EYEWITNESS TO EVENTS." Each caption included an arrow pointing towards Maddaus's photo at the center, with the word "GUILTY" superimposed over his face. Maddaus did not object to these slides.

It appears that the State displayed the slide that included the superimposed word "GUILTY" as the prosecutor made the following closing remarks:

> [Maddaus] adopted a disguise. He worked on a cover-up, and he worked like heck on this false alibi. "I was in Tumwater." "I was [getting] a tattoo." And the jail phone calls where he's pumping at Grimes and Leville. He's working on Theodore Farmer. He's working on Chelsea Williams because he's guilty and he's got to get out from underneath all that evidence. This defendant, ladies and gentlemen, this defendant, is the only one with motive, the only one with the means and the only one who is guilty of murder in the first degree. He is guilty of all the crimes alleged in the Information. He is guilty as charged, ladies and gentlemen, and guilty as proven.

Maddaus did not object to these statements.

REPORT AND RECOMMENDATION - 6

**C. Conviction and Sentence**

> The jury found Maddaus guilty of (1) first degree felony murder, (2) two counts of unlawful possession of a firearm, (3) first degree attempted kidnapping, (4) second degree assault, and (5) four counts of witness tampering. The jury returned special verdicts for firearm enhancements on the first degree murder, attempted kidnapping, and second degree assault charges…. Because of his prior "strike" offenses, the trial court sentenced Maddaus under the POAA, RCW 9.94A.570, to life without the possibility of early release.

Dkt. 77-1 at 15–20, Ex. 2 (internal citations and footnotes omitted) (alterations in original).

**B.    Procedural Background**

1.    <u>Direct Appeal</u>

Petitioner filed a direct appeal from his judgment and sentence to the State Court of Appeals. Dkt. 77-1 at 115–632, Exs. 4–10 (Cause No. 41795-2-II). Represented by counsel, Petitioner raised nineteen grounds for review. Dkt. 77-1 at 115–262, 570–597, Exs. 4, 9. Petitioner also filed a *pro se* direct appeal brief with ten additional grounds for review. Dkt. 77-1 at 461–569, Exs. 7, 8. The State Court of Appeals vacated one of the four counts of witness tampering and remanded the action to the Trial Court for resentencing on that ground; all other aspects of Petitioner's conviction and sentence were affirmed on direct appeal. Dkt. 77-1 at 39, Ex. 2.

Petitioner then sought discretionary review by the Supreme Court of Washington ("State Supreme Court"). Dkt. 77-1 at 669–859, Ex. 15 (Cause No. 62693-6). On July 9, 2014, the State Supreme Court denied the petition for discretionary review without comment. Dkt. 77-1 at 860–61, Ex. 16. Soon after, Petitioner filed a petition for writ of certiorari before the United States Supreme Court; this petition was denied on January 12, 2015. *See Maddaus v. Washington*, 574 U.S. 1088 (2015) (Cause No. 14–6966); *see also* Dkt. 77-2 at 66, Ex. 26.

1    Although the State Court of Appeals issued its mandate on July 17, 2014, Dkt. 77-1 at

2   862–64, Ex. 17, Petitioner's state-court conviction and judgment became final the day the United

3   States Supreme Court denied his certiorari petition. *See* 28 U.S.C. § 2244(d)(1)(A).

4          2.    State Collateral Review

5          Having exhausted his opportunities for direct review, Petitioner initiated a state collateral

6   attack on his conviction by filing a Personal Restraint Petition ("PRP"). Dkt. 77-2 at 68–726,

7   Exs. 27–29 (Cause No. 48369-6-II). The State Court of Appeals dismissed Petitioner's PRP on

8   December 1, 2016. Dkt. 77-2 at 727–32, Ex. 30. Petitioner then sought discretionary review by

9   the State Supreme Court. Dkt. 77-3 at 1–6, Ex. 31 (Cause No. 93958-6). The State Supreme

10  Court Commissioner denied review in a decision that was subsequently upheld by the State

11  Supreme Court. Dkt. 77-3 at 1–59, Exs. 31–34. On November 20, 2017, the State Supreme Court

12  issued a certificate of finality. Dkt. 77-3 at 60–61, Ex. 35.

13         3.    Other Collateral Proceedings in State Court

14         In the years following the denial of his PRP, Petitioner filed numerous other appeals,

15  petitions for review, and motions to modify rulings before the State Court of Appeals and the

16  State Supreme Court. Dkts. 77-3, 77-4, and 77-5, Exs. 36–97. Several of these filings concerned

17  Petitioner's requests to compel post-conviction delivery of his defense file from his trial attorney.

18  Dkts. 77-3, 77-4, and 77-5, Exs. 36, 43, 46, 76, 83, 87, and 89. These filings culminated in

19  Petitioner's petition for discretionary review by the State Supreme Court filed on July 1, 2021,

20  and his motion for discretionary review by the State Court of Appeals filed on May 4, 2022. Dkt.

21  77-5, Exs. 83, 89. In both filings, Petitioner sought review of lower-court decisions denying his

22  requests for a "complete and decipherable copy" of his case records. Dkt. 77-5, Exs. 83, 89.

23

24

1  Petitioner's requests for discretionary review (and his correlating motions to modify) were

2  denied. Dkt. 77-5, Exs. 86–96.

3          4.    <u>Instant Action for Federal Collateral Review</u>

4          Petitioner initiated this action for federal habeas relief on December 7, 2017. Dkt. 1.

5  Petitioner proceeded without the assistance of counsel until March 1, 2024, when Attorney

6  Jeffrey Ellis entered a notice of appearance on his behalf. Dkt. 69. Following his attorney's

7  notice of appearance, Petitioner was granted leave to amend his petition for writ of habeas

8  corpus. Dkt. 71. Petitioner, through counsel, filed his Second Amended Petition and

9  Memorandum in Support on April 19, 2024. Dkts. 74, 75.

10          On May 6, 2024, Respondent filed an Answer and Memorandum of Authority seeking

11  dismissal of the Second Amended Petition. Dkt. 76. Petitioner responded in opposition to the

12  Answer. Dkt. 80. Respondent did not file a reply before the deadline to do so elapsed. As such,

13  this matter is now fully briefed and ripe for consideration.

14                  **II.**    **DISCUSSION**

15  Petitioner raises six grounds for relief in his Second Amended Petition:

16  Claim No 1: Mr. Maddaus was Denied His Federal Due Process Rights Including
   his Right to a Fair Trial, to Counsel, and to be Present When, (5th, 6th and 14th
17  Amendments) Without any Showing of Need, He was Required to Wear a Shock
   Device Which Jurors Could See Outlined Under His Pants.

18  Claim No. 2: Mr. Maddaus was Denied his Federal Constitutional Right (5th/14th
19  Amendments) to Due Process and To Testify When, Without any Showing of Need,
   He was Forced to Wear a Shock Device that Impaired his Ability to Testify and
20  Negatively Affected His Demeanor.

21  Claim No. 3: Mr. Maddaus was Denied His Federal Constitutional Right (6th/14th
   Amendment) to Counsel When, Without any Showing of Need, He was Forced to
22  Wear a Shock Device that Interfered with His Ability to Consult with Counsel at
   Trial.

23  Claim No. 4: Mr. Maddaus was Denied Due Process (14[th] Amendment) Due to
24  Prosecutorial Misconduct in Closing Argument[.]

Claim No. 5: Mr. Maddaus was Denied Effective Assistance of Trial Counsel (6th/14th Amendments) When Counsel Failed to Object to Repeated instances of Prosecutorial Misconduct in Closing Argument[.]

Claim No[.] 6: Mr. Maddaus was Denied His Right to Due Process (14th Amendment) When He was Denied a Complete and Accurate Record for State Court Review.

Dkt. 74 at 4–5, 9. In his Memorandum in Support, Petitioner argues he is entitled to federal habeas relief on each Ground or, at a minimum, that he should be granted an evidentiary hearing to further develop his claims. Dkt. 75.

In his Answer, Respondent represents that the Second Amended Petition is timely and that each Ground raised therein was properly exhausted in state court. Dkt. 76 at 12. Thus, Respondent opposes the Second Amended Petition on the merits, arguing that none of Petitioner's claims are based on an unreasonable application of clearly established federal law, nor do they rest upon an unreasonable determination of fact by the state courts. *Id.* at 14–38. Respondent argues further that this matter can be resolved on the current record and Petitioner has not shown he is entitled to an evidentiary hearing. *Id.* at 12–14.

## A.  Legal Standard for Merits Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may not grant habeas relief on the basis of a claim adjudicated on the merits in state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In interpreting this portion of the federal habeas rules, the Supreme Court has ruled a state decision is "contrary to" clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) confronts facts "materially indistinguishable" from

relevant Supreme Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An unreasonable application of Supreme Court precedent occurs "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court decision involves an unreasonable application of Supreme Court precedent "'if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529 U.S. at 407).

With respect to § 2254(d)(2), a petitioner may only obtain relief by showing that the state court's conclusion was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. § 2254(d)(2)); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."). The Court presumes the state court's factual findings to be sound unless the petitioner rebuts the "presumption of correctness by clear and convincing evidence." *Dretke*, 545 U.S. at 240 (quoting 28 U.S.C. § 2254(e)(1)).

**B.      Unjustified Restraining Device Claims (Grounds One, Two, and Three)**

Petitioner's first set of habeas claims concerns the use of restraining devices without justification at trial. Dkt. 74 at 4–8. Throughout trial, Petitioner was required to wear a shock device and locking brace underneath his trousers. *Id.* Petitioner argues these restraints caused prejudice in three ways. *Id.* In Ground One, Petitioner argues the restraints were visible and caused jurors to conclude he was a violent individual who was likely guilty of the violent crimes for which he was charged. *Id.*; Dkt. 75 at 4–9, Dkt. 80 at 3–17. Petitioner next claims that the shock device, even if not visible to the jury, left him in constant fear of suffering a painful and debilitating shock if his movements were perceived as threatening and, as a result of this fear, he was hampered in his ability to consult with his attorney (Ground Two) and to testify in his defense (Ground Three) at trial. Dkt. 74 at 4–8; Dkt. 75 at 9–18; Dkt. 80 at 3–17.

Respondent argues Petitioner's restraining device claims fail for several reasons. For Ground One, Respondent argues the state courts correctly concluded that there was no indication in the record on direct appeal that any juror saw Petitioner's restraints. Dkt. 76 at 26–27. And, even if the Court were to consider Petitioner's later-developed evidence submitted during his state collateral review, Respondent argues there is still no evidence demonstrating actual prejudice from a juror observing the devices concealed under Petitioner's trousers. *Id.* at 27. Regarding Grounds Two and Three, Respondent argues that Petitioner cannot succeed on these claims because they are not based on clearly established federal law. *Id.* at 28–30.

The Court agrees with Respondent's arguments regarding Petitioner's first ground for relief. However, because it finds Petitioner has also failed to demonstrate prejudice with respect to his ability to confer with counsel and to testify at trial, the Court need not address

1 Respondent's other argument and will, instead, assume Grounds Two and Three are based on

2 clearly established federal law.[1]

3      The Fourteenth Amendment secures a criminal defendant's right to a fair trial. *Estelle v.*

4 *Williams*, 425 U.S. 501, 503 (1976). The presumption of innocence is a basic component of a fair

5 trial. *Estelle*, 425 U.S. at 503. The Supreme Court has determined that due process prohibits

6 certain courtroom practices that have the effect of undermining the presumption of innocence

7 and the fairness of the fact-finding process. *Deck v. Missouri,* 544 U.S. 622, 630 (2005)

8 (compelling a defendant to wear visible shackles before a jury without adequate justification

9 violates his right to a fair trial); *Estelle,* 425 U.S. at 504–05 (compelling a defendant to appear at

10 trial in jail garb is inherently prejudicial and violates due process); *c.f. Holbrook v. Flynn,* 475

11 U.S. 560 (1986) (holding that a prisoner was not denied his constitutional right to a fair trial

12 where, at his trial with five codefendants, the customary courtroom security force was

13 supplemented by four uniformed state troopers sitting in the first row of the public spectator

14 section).

15      Following the Supreme Court's decision in *Deck*, criminal defendants have a clearly

16 established constitutional right to be free of visible restraints in the presence of the jury unless an

17 essential state interest justifies the restraints. *Deck*, 544 U.S. at 629. To demonstrate a violation

18 of this right, a habeas petitioner must show that they were physically restrained in the presence

19 of the jury, that their restraints were seen by the jury, and that the physical restraints were not

20

21 [1] Notably, while it has not addressed the issues posed in this case directly, the Ninth Circuit has recognized the potential viability of similar claims in at least one habeas action. *See Gonzalez v. Pliler,* 341 F.3d 897, 904 (9th Cir. 2003) (granting evidentiary hearing on restraint claims alleging interference with right to counsel and ability to

22 testify); *see also Porter v. Terhune*, 235 F. App'x 551, 552 (9th Cir. 2007), *affirming Porter v. Terhune*, No. 00-cv-5468-NM-AJW, 2006 WL 4711856 (C.D. Cal. Apr. 17, 2006) (denying restraint claims involving interference with right to counsel and ability to testify for failure to show prejudice); *Sanders v. Ryan*, 533 F. App'x 706 (9th Cir.

23 2013), *affirming Sanders v. Schriro*, No. 05-cv-0572-PHX-EHC-MEA, 2009 WL 2870057 (D. Ariz. Sept. 2, 2009) (denying restraint claim based on interference with right to counsel for failure to show restraints were both

24 unjustified and prejudicial).

1   justified by state interests. *United States v. Casares*, 788 F.3d 956, 966 (9th Cir. 2015); *Williams*

2   *v. Woodford*, 384 F.3d 567, 592 (9th Cir. 2004) ("When the jury never saw the defendant's

3   shackles in the courtroom, we have held that the shackles did not prejudice the defendant's right

4   to a fair trial.").

5          In *Deck*, the Supreme Court also recognized other ways in which unjustified restraints

6   undermine the fairness of trial proceedings. *Deck*, 544 U.S. at 631. Physical restraints, which

7   tend to "confuse and embarrass defendants' mental faculties," can interfere with a criminal

8   defendant's ability to communicate with his attorney. *Id.* (citing *Illinois v. Allen*, 397 U.S. 337,

9   344 (1970) and *People v. Harrington*, 42 Cal. 165, 168 (1871)). Likewise, courtroom restraints

10  can diminish a defendant's ability to participate in his own defense "by freely choosing whether

11  to take the witness stand on his own behalf." *Id.* (citation omitted).

12         Although these alternative sources of prejudice were not squarely at issue in *Deck*, the

13  Supreme Court stated its holding against the unjustified use of restraints, its similar statements

14  made in prior cases, and a consensus of lower court decisions all identified "a principle deeply

15  embedded in the law." *Id.* at 629. And, even before the Supreme Court's decision in *Deck*, the

16  Ninth Circuit explained that the constitutional rule against unjustified restraints at trial is

17  longstanding and one of general application. *Gonzalez*, 341 F.3d at 904 (citing *Allen*, 397 U.S. at

18  344); *C.f. Mungo v. United States*, 987 A.2d 1145, 1149–50 (D.C. 2010) (declining to extend

19  *Deck*'s rule against unjustified restraints to the use of a less-obvious stun belt during jury

20  selection). Thus, for the purpose of the discussion here, the Court will assume that in this case

21  criminal defendants also have a clearly established right to be free from unjustified restraints—

22  visible or nonvisible—that interfere with their ability to confer with counsel and to testify at trial.

23

24

1    If a constitutional error regarding the use of unjustified restraints is found, a habeas

2    petitioner must then show the error had a "substantial and injurious effect" on the jury's verdict.

3    *Castillo v. Stainer,* 997 F.2d 669, 669 (9th Cir. 1993). To determine whether the imposition of

4    physical restraints constitutes prejudicial error, federal habeas courts consider "the appearance

5    and visibility of the restraining device, the nature of the crime with which the defendant was

6    charged, and the strength of the state's evidence against the defendant." *Larson v. Palmateer*,

7    515 F.3d 1057, 1064 (9th Cir. 2008) (discussing application of *Brecht*). Explained further:

8    The greater the intensity of shackling…the greater the extent of prejudice because
     elaborate physical restraints are more likely to create the appearance of the
9    defendant's dangerousness. Hence, physical restraints such as a waist chain, leg
     irons or handcuffs may create a more prejudicial appearance than more unobtrusive
10   forms of restraint. Similarly, if the defendant is charged with a violent crime, then
     the risk of prejudice increases, because shackling essentially brands him as having
11   a violent nature. Concerns about prejudice may be mitigated, however, if the state's
     evidence against the defendant was overwhelming.
12
13   *Larson*, 515 F.3d at 1064 (cleaned up); *United States v. Wiley*, No. 22-50235, --- F.4th ----, 2024

14   WL 2745123, at *2 (9th Cir. May 29, 2024) (concluding, on direct appeal, that ankle monitors

15   are less prejudicial than shackles and handcuffs). Even where interference with the ability to

16   consult with defense counsel or to testify is alleged, a petitioner must still demonstrate

17   substantial prejudice. *See Johnson v. Sperfslage*, 768 F. App'x 592, 594 (8th Cir. 2019)

18   ("Because Deck was decided on direct appeal…it did not clearly establish a [presumed

19   prejudice] standard for collateral proceedings."); *see also Sanders*, 533 F. App'x at 709

20   (applying substantial prejudice standard to habeas claim based on a government interference with

21   the right to counsel).

22   Petitioner first raised his unjustified restraint claims on direct appeal, where the State

23   Court of Appeals rejected the claims in a reasoned decision. Dkt. 77-1, Exs. 2–10. The claims

24   were then presented in his petition for discretionary review by the State Supreme Court, which

1    was denied without comment. Dkt. 77-1, Exs. 15–16. Petitioner also raised his restraint claims in

2    his PRP, but the State Court of Appeals found the claims were barred from collateral review by

3    Washington State's relitigation rule, Dkt. 77-2 at 727–32, Ex. 30, and this decision was upheld

4    by the State Supreme Court, Dkt. 77-3 at 1–6, 58–59, Exs. 31, 34. The Ninth Circuit has held

5    that denial of a claim under a state's relitigation bar does not constitute an adjudication on the

6    merits or a denial on procedural grounds for the purpose of habeas review. *Pirtle v. Morgan*, 313

7    F.3d 1160, 1168 (9th Cir. 2002). Thus, this Court must "look through" to the last reasoned

8    decision issued on the merits by the State Court of Appeals on direct appeal. *Ylst v. Nunnemaker*,

9    501 U.S. 797, 804–05 and n. 3 (1991).

10       The State Court of Appeals addressed Petitioner's unconstitutional restraint claim as

11   follows on direct appeal:

12       Maddaus next argues that the trial court violated his due process rights by allowing
         him to be restrained at trial with a leg brace and shock device absent a showing of
13       "impelling necessity" and that his counsel was ineffective in failing to object to
         these restraints. These arguments fail.

14
         A defendant in a criminal case is entitled to appear at trial free from all bonds or
15       shackles except in extraordinary circumstances. *State v. Finch,* 137 Wash.2d 792,
         842, 975 P.2d 967 (1999). Shackling or handcuffing infringes on a defendant's right
16       to a fair trial for several reasons, including that it violates a defendant's presumption
         of innocence. *Finch,* 137 Wash.2d at 844, 975 P.2d 967. In order to protect the
17       defendant's rights, the trial court must exercise discretion in determining the extent
         to which restraints are necessary to maintain order and to prevent injury, supported
18       by a factual basis set forth in the record. *Finch,* 137 Wash.2d at 846, 975 P.2d 967
         (citing *State v. Hartzog,* 96 Wash.2d 383, 400, 635 P.2d 694 (1981)). Nevertheless,
19       a claim of unconstitutional shackling is subject to a harmless error analysis. *State
         v. Jennings,* 111 Wash.App. 54, 61, 44 P.3d 1 (2002) (citing *State v. Damon,* 144
20       Wn.2d 686, 692, 25 P.3d 418, 33 P.3d 735 (2001)).

21       Although the record does not reflect the trial court's reasons for restraining
         Maddaus, we hold that any error in doing so was harmless in light of the trial court's
22       repeated efforts to prevent any prejudice that might have flowed to Maddaus if the
         jury had seen these restraints. On multiple occasions before the jury returned to the
23       courtroom, defense counsel notified the court about his concern that Maddaus's
         shock device or leg brace might be visible to the jury. Each time, the trial court

24

REPORT AND RECOMMENDATION - 16

accommodated Maddaus's requests by having him take the stand before the jury entered and by arranging the defense table in such a way as to block the jurors' view of Maddaus's restraints. Consequently, the record contains no evidence that any member of the jury ever saw these restraints and, thus, no possibility of prejudice to Maddaus.

We hold that, because the jury did not see Maddaus's restraints, there was no prejudice to him, and any error in ordering Maddaus to wear them was harmless. *Jennings,* 111 Wash.App. at 61, 44 P.3d 1. And because Maddaus fails to show prejudice, he also fails to show ineffective assistance where defense counsel initially objected to the restraints, persuaded the trial court to recognize a potential problem, and then worked with the court to block the jury's view of the restraints.

[Footnote 18:] Although Maddaus contends that the restraints interfered with his ability to assist counsel and with his ability to testify, these bare allegations are not sufficient to establish prejudice based on the record before us. To the extent Maddaus has evidence outside the record supporting his claims of prejudice, he must raise any such claims in a personal restraint petition. *McFarland*, 127 Wash.2d at 335.

Dkt. 77-1 at 22–23, Ex. 2 (record citations omitted).

The Court will assume *arguendo*, as the state courts did, that the Trial Court committed constitutional error in requiring Petitioner to wear restraints during his jury trial without first identifying whether any state interest justified the restraints. As such, the Court need only consider whether the state courts unreasonably concluded any resulting constitutional error was harmless because Petitioner failed to demonstrate prejudice. As noted above, Petitioner identifies three potential sources of prejudice caused by his restraints: juror bias (Ground One), interference with his right to counsel (Ground Two), and interference with his ability to testify (Ground Three). Dkt. 74 at 4–9; Dkt. 75 at 4–18. The Court addresses each in turn.

1.    Ground One—Juror Bias

The Court begins with Petitioner's argument that his restraints were visible to jurors and therefore biased the jury against him. Because the state court's findings of fact are presumed correct, the Court must accept the state court's finding that the restraining devices were not

1    visible to the jury unless the finding is (1) rebutted by clear and convincing evidence or (2) based

2    on an unreasonable evidentiary foundation. *See* 28 U.S.C. §§ 2254(d)(2) & 2254(e)(1) (1999);

3    *Zichko v. Idaho,* 247 F.3d 1015, 1019 (9th Cir. 2001). Petitioner argues that this factual finding

4    should be set aside for two reasons, and neither prevails.

5    First, Petitioner argues the state courts unreasonably determined that the trial record

6    demonstrated no juror saw his restraints because the visual barriers discussed in the direct-appeal

7    decision were not in place for the entire trial. Dkt. 75 at 5–6; Dkt. 80 at 14–18. Petitioner posits

8    that the inconsistent use of visual barriers by the Trial Court actually highlighted the restraining

9    devices for the jury. This argument proceeds as follows: the visual barriers erected early in the

10   trial led jurors to believe there was something under the defense table that they were not

11   permitted to see; therefore, when the visual barriers were later removed and the bulging outline

12   of the concealed restraining devices made visible to the jury, jurors would necessarily conclude

13   that the newly visible bulges were concealed devices used to restrain a dangerous individual.

14   Dkt. 75 at 6–9; Dkt. 80 at 14–18.

15   Petitioner's first argument is unavailing for at least two reasons. First, as the state courts

16   explained, the trial record indicates that the cardboard barriers placed around the defense table

17   resembled exhibits. Dkt. 77-1 at 18, Ex. 2 (referencing Dkt. 77-6 at 597, Ex. 111). Therefore, it is

18   unlikely the placement of visual barriers around the defense table would have caused a juror to

19   conclude that they were being prevented from seeing something prejudicial on or near Petitioner.

20   Next, even if the visual barriers caused jurors to speculate about what was under the

21   defense table, it would be impossible for a juror to deduce the precise nature of the objects being

22   hidden from their view. Thus, when the visual barriers were removed later in the trial, a juror

23

24

1    could fairly assume that the objects necessitating the visual barriers were also removed and that

2    any objects remaining under the table were innocuous.

3          The likelihood that jurors would make innocuous—rather than prejudicial—assumptions

4    about any visible protrusions on Petitioner's legs is reinforced by statements the prosecutor made

5    when discussing the devices early in the trial. Remarking on the ambiguous appearance of the

6    shock device and locking brace under Petitioner's trousers, the prosecutor explained:

7          Since we're making a record, if I may, I think this is much ado about nothing, and
8          it's something that has been manufactured by the defendant. I understand from
           corrections staff that the defendant downstairs has the option of wearing baggier
9          trousers, but apparently, he has elected not to. In any event, like Your Honor, he's
           wearing black trousers, and *something underneath the trousers may be visible, but*
10         *there are all kinds of folks that have prosthetic devices or knee braces or ace*
           *bandages or any number of items underneath their clothing. There's nothing to*
11         *suggest that he is in custody.*

12   Dkt. 77-6 at 598–99, Ex. 106 (emphasis added). This statement highlights the fundamental flaw

13   in Petitioner's argument: he has not shown by clear and convincing evidence that a juror who

14   observed something concealed under his trousers would have realized he was wearing a

15   restraining device. *C.f. Larson*, 515 F.3d at 1064 (explaining that unobtrusive forms of restraint

16   are less likely to bias a jury than an obvious shackling). For this reason, Petitioner's argument

17   about the placement and removal of visual barriers is insufficient to show the state courts erred in

18   finding that no juror saw (and recognized) his concealed restraining devices. Rather, the state

19   courts' finding that no prejudice occurred was properly supported by the record on direct appeal.

20         Petitioner's second argument is that the affidavit he submitted with his PRP is sufficient

21   to overcome the presumption of correctness afforded to the state courts' factual finding. Dkt. 75

22   at 6–9; *See* Dkt. 80 at 10–14. However, this aspect of Petitioner's PRP was dismissed pursuant to

23   Washington State's relitigation bar, Dkts. 77-2 at 727–32 and 77-3 at 1–6, Exs. 30, 3, which is

24

1    not considered an adjudication on the merits for habeas review, *Pirtle*, 313 F.3d at 1168. As

2    such, the Court's review is limited to the evidentiary record before the state court on direct

3    appeal. 28 U.S.C. § 2254(d)(2) (habeas relief "shall not be granted with respect to any claim that

4    was adjudicated on the merits in State court proceedings unless the adjudication of the claim. . .

5    resulted in a decision that was based on an unreasonable determination of the facts *in light of the*

6    *evidence presented in the State court proceeding*") (emphasis added); *Cullen v. Pinholster*, 563

7    U.S. 170, 181 (2011) (federal habeas review "is limited to the record that was before the state

8    court that adjudicated the claim on the merits").

9        Petitioner disagrees and contends the state court decisions concerning his PRP were the

10   final rulings on the merits of his claims. Dkt. 80 at 10 ("The last reasoned state court decision on

11   this issue was the *Ruling Denying Review* by the Washington Supreme Court."). Even accepting

12   Petitioner's contention, his second argument fails for another reason—as explained by the State

13   Supreme Court Commissioner, the portion of his PRP affidavit discussing what the jury observed

14   is conclusory and not based on personal knowledge:

15       Mr. Maddaus generally argues that the acting chief judge erred in dismissing his
         petition because he provided new evidence that was not available to him on direct
16       appeal. But as detailed below, Mr. Maddaus's arguments merit neither this court's
         discretionary review nor postconviction relief.

17
         First, Mr. Maddaus argues that the trial court violated his rights by requiring him
18       to wear a locking leg brace on his right leg and a Band-It[2] restraint on the calf of
         his left leg. Trial counsel objected to the device, which the trial court stated looked
19       like a walking cast. On direct appeal, the Court of Appeals rejected this claim,
         holding that Mr. Maddaus could not establish prejudice. It noted, however, that if
20       Mr. Maddaus produced evidence not in the record that demonstrated prejudice, he
         could raise the issue in a personal restraint petition. The acting chief judge in
21       connection with the personal restraint petition held that the issue had already been
         addressed on direct appeal and that Mr. Maddaus provided no basis for reexamining
22       the issue.

23
_____
24   [2] "Band-It" is the manufacturer name for the shock device worn by Petitioner.

1

2

3

4

5

6

7

8

9

    As the acting chief judge noted, a petitioner may not relitigate an issue that was raised and rejected on direct appeal unless the interests of justice require such relitigation. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013). Merely repackaging the substance of an argument into a new form will not avoid this relitigation bar. *In re Pers. Restraint of Jeffries*, 114 Wn.2d 485, 489, 789 P.2d 731 (1990). On direct appeal, Mr. Maddaus raised the issue of the trial restraints, and the court held that he could not demonstrate prejudice. With his personal restraint petition, Mr. Maddaus includes a declaration stating that he did not consult with his attorney during the trial out of fear of being shocked, and for the same reason he refrained on many occasions from pointing something out to counsel or requesting that a question be asked of a witness. He also argues that jurors must have seen the device and assumed that he was dangerous as a result. But these unsupported and conclusory assumptions do not constitute the evidence of prejudice needed to merit revisiting the issue already rejected on direct appeal. A petitioner may not provide only unsupported conclusions; he must provide evidence of actual and substantial prejudice. *See Yates*, 177 Wn.2d at 17–18. Here, Mr. Maddaus provides no evidence of actual prejudice. Accordingly, the acting chief judge properly found this claim frivolous.

10

11

12

13

14

15

16

Dkt. 77-3 at 3–4, Ex. 31. If the State Supreme Court's PRP decision constitutes an adjudication on the merits, then this Court must afford deference to its factual findings and legal conclusions under 28 U.S.C. § 2254(d). *See generally Williams v. Filson*, 908 F.3d 546, 562–63 (9th Cir. 2018). This deference extends to the State Supreme Court's determination that Petitioner's statements about jurors seeing his restraints were conclusory, unsupported, and insufficient to show prejudice.

17

    Petitioner's PRP affidavit includes the following statements about what jurors could see:

18

19

20

    I had to stand a countless number of times throughout the trial, and *every time I did some of the jurors could see the shock device on my leg*. Additionally, I saw several jurors staring curiously at the pieces of cardboard surrounding the defense table. After the first week of trial, all of the pieces of cardboard were taken down and forgotten, and *all of the jurors could see the shock device for the rest of my trial*.

21

22

Dkt. 77-2 at 113–14, Ex. 27. But the PRP affidavit does not sufficiently explain how these conclusions were based on Petitioner's personal knowledge rather than mere speculation.[3] *See*

23

24

---

[3] Petitioner was, of course, physically present during his trial, but this does not grant him omniscience for all that occurred within the courtroom. If Petitioner sat in the jury box and personally observed what the outline of a

1  *Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (habeas relief may not be granted "on the basis of

2  little more than speculation"); *Cooks v. Spalding*, 660 F.2d 738, 740 (9th Cir. 1981) (claims that

3  "amount[] to mere speculation" do not warrant habeas corpus relief).

4          Petitioner merely relies upon the observations of others to support his conclusions. For

5  example, he states that the (1) trial judge "said she could see it through my pants from across the

6  room" and (2) his attorney objected "because it could easily be seen by the jurors." Dkt. 77-2 at

7  113, Ex. 27. Although the trial record reflects that defense counsel believed jurors could see the

8  concealed devices, the trial judge demurred and did not believe the nature of the restraints were

9  obvious, stating on one occasion that "I do not notice the leg brace or the Band-It," Dkt. 77-6 at

10 597, Ex. 111, and at another time commenting that the bulge on Petitioner's leg "looks more like

11 a walking cast, but again, just to be cautious, I think I've taken care of it." *Id.* at 8, Ex. 106.

12         In sum, Petitioner's PRP affidavit demonstrates only that he and his attorney were

13 concerned about the jury noticing the concealed restraining devices and that he was concerned

14 after noticing the jurors looking at the cardboard barriers. These concerns, without more, are

15 insufficient to demonstrate the jurors actually saw a device on Petitioner's leg and, if they did,

16 that they would have been aware of the nature of the concealed device. Thus, the Court finds

17 Petitioner has not rebutted the state court's factual finding—either on direct appeal or collateral

18 review—that no juror saw his restraints. Rather, this finding was supported by evidence before

19 the state courts on both level of review.

20         Because Petitioner has not shown that the state courts' denial of his visible restraint claim

21 was contrary to, or an unreasonable application of, clearly established federal law, or that it was

23 concealed shock device looked like from someone in that position, this necessary foundation for his conclusions was
   not included in the PRP affidavit.

1  based on an unreasonable determination of the fact based on the record before it, Ground One

2  should be **DENIED**.

3          2.      Grounds Two and Three—Interference with Counsel and Testimony

4          Petitioner next argues that the state courts unreasonably determined his PRP affidavit did

5  not demonstrate prejudice with respect to his ability to consult with counsel and to testify while

6  wearing a nonvisible shock device at trial. Dkt. 75 at 9–18; Dkt. 80 at 4–13. In reaching this

7  argument, the Court proceeds on the assumptions *arguendo* that Grounds Two and Three are

8  based on clearly established federal law and that the state court decisions on collateral review

9  were rulings on the merits of Petitioner's claims. Even so, Petitioner fails to persuade that the

10 state courts unreasonably determined his PRP affidavit was insufficient to show prejudice.

11         Petitioner's PRP affidavit states the following regarding his ability to consult with his

12 defense attorney at trial:

13         Throughout the trial, there was always a guard sitting close behind me with their
           hand on the remote control that triggered the Band-It. I was terrified of receiving a
14         painful and debilitating shock the entire time. I did not consult with my attorney
           during trial because I was afraid I would be shocked if I made an effort to tell him
15         something. There were many times I wanted to point things out to my attorney, or
           questions I wanted him to ask witnesses, but I didn't because I was afraid of being
16         shocked. My strategy to avoid being shocked was to sit still and be quiet.

17 Dkt. 77-2 at 114, Ex. 27.

18         Unlike his statements about juror bias, Petitioner's statements about his ability to consult

19 with his attorney are based on personal knowledge. Nevertheless, Petitioner's claim that he was

20 too afraid to speak to his attorney while wearing the shock device lacks credibility as this section

21 of his PRP affidavit is undermined by an earlier section claiming that Petitioner immediately

22 shared his concerns about wearing the shock device with his attorney. Dkt. 77-2 at 113, Ex. 27

23 ("As soon as I got to the courtroom, I told my attorney about the shock device they had made me

24

REPORT AND RECOMMENDATION - 23

1   wear."). In addition, while Petitioner was wearing the shock device, verbatim transcripts of trial

2   proceedings reflect that he made "*sotto voce* comments" to his attorney and was given an

3   instruction to be quiet. Dkt. 77-6 at 221, Ex. 107.

4         Furthermore, Petitioner's bare allegation that there were "many times" he did not consult

5   with his attorney about witnesses or other matters is unaccompanied by specific allegations

6   showing how his inability to communicate freely actually hindered the presentation of his

7   defense. Stated another way, the statements in Petitioner's PRP affidavit are too broad for the

8   Court to assess what prejudice—if any—was caused by the unspecified "things" or "questions"

9   Petitioner would have brought to his attorney's attention if he had not worn the shock device.

10  *See, e.g.*, *Porter*, 2006 WL 4711856, at *19 (finding no prejudice where habeas petitioner

11  presented more detailed allegations about how a shock belt prevented him from assisting his

12  attorney in presenting the defense).

13        Because this section of Petitioner's PRP affidavit is unsupported and lacks sufficient

14  credibility, the state courts reasonably determined Petitioner failed to demonstrate prejudice

15  caused by the shock device's alleged interference with his ability to consult with defense counsel

16  at trial.

17        Ground Three, which Petitioner supports with statements about his inability to testify

18  while wearing the shock device, fails for similar reasons.

19        On this topic, Petitioner's PRP affidavit states:

20        When I was seated on the witness stand, I could see the guard with the remote
          control device that triggered the shock device on my leg. The entire time, the guard
21        was sitting there with his hand on the device and his finger hovering over the
          trigger. I made me extremely nervous and I was not able to pay attention to the
22        question the attorneys were asking me…. My attorney pulled me off of the stand
          before asking me all of the questions he had planned on asking me. When I asked
23        him why he had pulled me off the stand early, he said that I looked distracted,
          uncomfortable, and nervous.

24

1   Dkt. 77-2 at 114, Ex. 27.

2          These relatively nascent statements, too, appear to be unsupported by the record and

3   exaggerated. The 83 pages of verbatim transcripts capturing Petitioner's trial testimony reveal

4   that he testified at length and in detail on his own behalf. Dkt. 77-7 at 747–808, 811–19, 821–

5   832, Ex. 119. While on the stand, Petitioner gave thorough responses to questions about his

6   actions, conversations, and whereabouts from the time he learned of the robbery until he was

7   arrested and charged for the assault, kidnapping, murder, and firearm offenses. *Id.* He testified

8   that the assault and kidnapping charges resulted from a misunderstanding after he accidentally

9   discharged a can of bear mace while trying to convince Jessica Abear to tell him who was

10  responsible for the robbery. *Id.* at 757–58. He also testified that he believed it was Matthew

11  Tremblay, not him, who was responsible for the murder of Shaun Peterson. *Id.* at 790–96, 808.

12  Finally, Petitioner explained why he wanted to avoid the police after Shaun Peterson was killed

13  and offered other explanations relevant to the witness tampering offenses. *Id.* at 795–807.

14         In sum, Petitioner's trial testimony was comprehensive, responsive to questioning, and

15  touched on key aspects of the defense theory. Therefore, Petitioner's broad claim that his

16  testimony was cut short because of the alleged psychological effect of the shock device, without

17  more, lacks credibility and is insufficient to show prejudice given the record at trial.

18         Overall, Petitioner's PRP affidavit does not identify, with any manner of specificity or

19  credibility, the ways in which his nonvisible restraints had a substantial and injurious effect on

20  the jury's verdict. Thus, the state court did not unreasonably determine—whether on direct

21  appeal or collateral review—that no prejudice was caused by Petitioner's nonvisible restraints.

22         Because Petitioner has not shown that the state courts' denial of his nonvisible restraint

23  claims was contrary to, or an unreasonable application of, clearly established federal law, or that

24

1    this decision rested upon an unreasonable determination of the facts based on the record before

2    it, Grounds Two and Three should be **DENIED**.

3    **C.    Closing Argument Claims (Grounds Four, Five, and Six)**

4        Petitioner's second set of habeas claims concerns the alleged prosecutorial misconduct

5    that occurred during closing argument. Dkt. 74 at 9–16; Dkt. 75 at 18–27; Dkt. 80 at 17–22. In

6    Ground Four, Petitioner alleges that the prosecutor engaged in misconduct by (1) disparaging

7    defense counsel, (2) expressing his personal opinion, and (3) using "inflammatory" PowerPoint

8    slides. Dkt. 74 at 9–16; Dkt. 75 at 18–25; Dkt. 80 at 17–20. Next, in Ground Five, Petitioner

9    asserts that defense counsel was constitutionally deficient for failing to object to this alleged

10   misconduct. Dkt. 74 at 9; Dkt. 75 at 26; Dkt. 80 at 22. Finally, in Ground Six, Petitioner argues

11   he was denied due process of law because the state courts, when assessing whether prosecutorial

12   misconduct occurred on direct appeal, examined black-and-white photocopies of the prosecutor's

13   PowerPoint slides rather than the original digital files with full color and animations. Dkt. 74 at

14   9; Dkt. 75 at 25–27; Dkt. 80 at 21; *see also* Dkt. 77-2 at 131, Ex. 27 (photocopied slide).

15       Respondent argues that each Ground should be dismissed because the state courts

16   reasonably rejected Petitioner's closing argument claims on direct appeal and, in doing so, were

17   not required to review the original digital slides. Dkt. 76 at 31–38. Respondent adds that

18   Petitioner's closing argument claims rely heavily on state court decisions, rather than those

19   demonstrating clearly established federal law. *Id.* at 38. The Court agrees with Respondent and

20   finds that Petitioner is not entitled to federal habeas relief on the remaining Grounds.

21       1.    Grounds Four and Five—Improper Closing Argument and Failure to Object

22       Because Petitioner's prosecutorial misconduct and ineffective assistance of counsel

23   claims mirror one another, the Court addresses Grounds Four and Five together.

24

1    When a prosecutor's conduct is placed in question, unless the conduct impermissibly

2    infringes on a specific constitutional right, the standard of review is the "narrow one of due

3    process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168,

4    181–82 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 642–43 (1974). To obtain relief on a

5    claim of prosecutorial misconduct, a federal habeas petitioner must do more than show that "the

6    prosecutors' remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at

7    180–81. A petitioner must demonstrate that the allegedly improper conduct "so infected the trial

8    with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at

9    181 (quoting *Donnelly*, 416 U.S. at 643).

10    On habeas review, a court "must consider the probable effect the prosecutor's [conduct]

11    would have on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S.

12    1, 12 (1985). To do so, the prosecutor's conduct must be viewed in context. *See Boyde v.*

13    *California*, 494 U.S. 370, 385 (1990); *United States v. Robinson*, 485 U.S. 25, 33–34 (1988);

14    *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998). A reviewing court must also keep in mind

15    that a prosecutor has wide latitude to make reasonable inferences based on the evidence during

16    closing argument. *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991). Further, a

17    prosecutor's closing argument is not evidence and ordinarily carries less weight with the jury

18    than the court's instructions. *Boyde*, 494 U.S. at 384; *Houston v. Roe*, 177 F.3d 901, 909 (9th Cir.

19    1999). Generally, prosecutorial argument should not result in reversal where the trial court

20    instructed the jury that its decision must be based solely upon the evidence, where the defense

21    did not object, where the comments did not misstate the record, or where there is overwhelming

22    evidence of guilt. *Darden*, 477 U.S. at 182; *Donnelly v. DeChristoforo*, 416 U.S. 637, 640–45

23

24

1    (1974); *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993); *Hall v. Whitley*, 935 F.2d 164,

2    165–66 (9th Cir. 1991).

3    Next, the Sixth Amendment guarantees a criminal defendant the right to effective

4    assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). "The essence of an

5    ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial

6    balance between defense and prosecution that the trial was rendered unfair and the verdict

7    rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986). Claims of ineffective

8    assistance of counsel are evaluated under the two-prong test set forth in *Strickland*. Under

9    *Strickland*, a petitioner must prove (1) that counsel's performance was deficient and, (2) that the

10   deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. An ineffective

11   assistance of counsel claim may fail under either prong. *See id.*

12   With respect to the first prong of the *Strickland* test, a petitioner must show that counsel's

13   performance fell below an objective standard of reasonableness. *Id*. at 688. Judicial scrutiny of

14   counsel's performance must be highly deferential. *Id*. at 689. "A fair assessment of attorney

15   performance requires that every effort be made to eliminate the distorting effects of hindsight, to

16   reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

17   counsel's perspective at the time." *Id*. at 689. In order to prevail on an ineffective assistance of

18   counsel claim, a petitioner must overcome the presumption that counsel's challenged actions

19   might be considered sound trial strategy. *Id*.

20   The second prong of the *Strickland* test requires a showing of actual prejudice related to

21   counsel's performance.  In order to establish prejudice, a petitioner "must show that there is a

22   reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

23

24

1    would have been different. A reasonable probability is a probability sufficient to undermine

2    confidence in the outcome." *Id*. at 694.

3         While the *Strickland* standard for ineffective assistance of counsel claims is clearly

4    established federal law, it is not the role of federal habeas courts to evaluate whether defense

5    counsel's performance fell below the *Strickland* standard. *Harrington*, 562 U.S. at 101. Rather,

6    when considering an ineffective assistance of counsel claim on federal habeas review, "[t]he

7    pivotal question is whether the state court's application of the *Strickland* standard was

8    unreasonable." *Id*. As the Supreme Court explained in *Harrington*, "[a] state court must be

9    granted a deference and latitude that are not in operation when the case involves review under

10   the *Strickland* standard itself." *Id*.

11        Finally, a trial error—such as improper closing argument or failure to raise a critical

12   objection—is presumed to be harmless unless the error had a "substantial and injurious effect or

13   influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. It is the petitioner's burden

14   to state facts that point to a real possibility of constitutional error in this regard. *See O'Bremski v.*

15   *Maass*, 915 F.2d 418, 420 (9th Cir. 1990).

16        Like in his Second Amended Petition, Petitioner raised parallel prosecutorial misconduct

17   and ineffective assistance of counsel claims challenging the State's closing argument on direct

18   appeal. Dkt. 77-1, Exs. 2–10. The State Court of Appeals rejected both claims in a reasoned

19   decision. Dkt.77-1 at 30–33, Ex. 2. The claims were then included in his petition for

20   discretionary review by the State Supreme Court, which was denied without comment. Dkt. 77-

21   1, Exs. 15–16. As with his restraint claims, Petitioner sought state collateral review of his closing

22   argument claims in his PRP, but the State Court of Appeals rejected the claims under the state

23   relitigation bar. Dkt. 77-2 at 727–32, Ex. 30. This decision was undistributed by the State Supreme

24

1  Court in a reasoned decision declining discretionary review. Dkt. 77-3 at 1–6, 58–59, Exs. 31,

2  34. Thus, the Court looks through to the State Court of Appeals' decision on direct appeal, which

3  is the last reasoned decision on the merits.

4      After outlining the applicable standards of review, the State Court of Appeals examined

5  Petitioner's parallel prosecutorial misconduct and ineffective assistance of counsel claims as

6  follows:

7  ### [1]. Disparaging Defense Counsel

8      Maddaus argues…that the prosecutor infringed on his constitutional right to
9      counsel by disparaging the role of defense counsel and impugning counsel's
       integrity when the prosecutor (1) claimed that defense counsel's investigator had
10      been "duped," (2) compared defense counsel's argument to "the distractions that
       sometimes people create when they're passengers in a vehicle," and (3) stated that
11      what the jury heard from the defense's witnesses were "the last effort to develop
       lies." Maddaus further argues that he received ineffective assistance based on his
12      counsel's failure to object to this alleged prosecutorial misconduct. Maddaus
       correctly notes that it is improper for the prosecutor to comment disparagingly on
13      defense counsel's role or to impugn the defense lawyer's integrity. *Thorgerson,* 172
       Wash.2d at 451, 258 P.3d 43. But this did not happen here.
14

15      Here, the State neither disparaged counsel nor accused him of wrongdoing when it
16      suggested that defense counsel's investigator had been "duped" into being
       Maddaus's agent. There was no insinuation of misconduct or lack of integrity on
17      the part of defense counsel; nor did this statement impugn defense counsel. Rather,
       the statement focused on the defense investigator; and even then, it did not actually
18      disparage him by suggesting that he had been "duped" by some external event or
       person. The same holds true for the defense's second challenged statement—that
19      defense's witnesses had engaged in a "last effort to develop lies." This statement
       similarly did not call defense counsel's integrity into question. Rather, the State
20      was articulating reasons why the jury should find that the defense *witnesses* were
21      not telling the truth.

22      The record does not support Maddaus's argument that the prosecutor committed
       misconduct in this way. In short, he shows no prejudice; thus, Maddaus also fails
23      to establish both reversible error and ineffective assistance of counsel for failing to
       object to these comments.
24

**[2]. "Poppycock," "Unreasonable," "Crazy," "Duped" [*i.e.*, Personal Opinion]**

Maddaus next argues that the State committed prosecutorial misconduct during closing arguments by calling defense testimony "poppycock," "unreasonable under the law," and "crazy," and suggesting that Maddaus had "duped" the defense investigator. We find *State v. Copeland* instructive: There, the prosecutor told the jury, "[Y]ou'll find as a jury that [Copeland] lied when he took the stand," and he suggested that Copeland was "lying" when he made several other statements (based on contradictory testimony from other witnesses). *State v. Copeland,* 130 Wash.2d 244, 291–92, 922 P.2d 1304 (1996). Our Supreme Court held the prosecutor's argument was not improper because he was arguing inferences from the evidence; it also held that "a curative instruction would have neutralized any prejudice." *Copeland,* 130 Wash.2d at 291–92, 922 P.2d 1304.

The statements at issue here were more flagrant and ill-intentioned than those in *Copeland,* but Maddaus fails to show that they rose to the level of being "so flagrant and ill-intentioned" that they, too, could not have been neutralized by a curative instruction. *Dhaliwal,* 150 Wash.2d at 578, 79 P.3d 432. Thus, we do not further consider the merits of his challenge for the first time on appeal.

To the extent that Maddaus also argues that his trial counsel was ineffective for failing to object to these comments, we note that defense counsel may have had strategic reasons for not objecting to these comments, such as preferring not to draw the jury's attention to them. *See Grier,* 171 Wash.2d at 32–33, 246 P.3d 1260; *State v. Madison,* 53 Wash. App. 754, 763, 770 P.2d 662 (1989) ("The decision of when or whether to object is a classic example of trial tactics.").

**[3]. PowerPoint Slides**

Maddaus also argues for the first time on appeal that (1) the State engaged in prosecutorial misconduct when it displayed a Microsoft PowerPoint slide containing a photograph of Maddaus wearing a wig police had found in his vehicle, the word "GUILTY" written beneath it, and other similar words surrounding it, along with several other slides depicting exhibits with additional superimposed text; and (2) his counsel was ineffective in failing to object…. These arguments also fail.

Our Supreme Court recently reversed a guilty verdict and remanded for a new trial after the prosecuting attorney made a sequential electronic slide presentation to the jury graphically displaying his personal opinion that the defendant was "guilty,

guilty, guilty" of the charged crimes. *Glasmann,* 175 Wash.2d at 699, 286 P.3d 673. The Supreme Court described these slides as follows:

> In one slide, the booking photo appeared above the caption, "DO YOU BELIEVE HIM?" In another booking photo slide the caption read, "WHY SHOULD YOU BELIEVE ANYTHING HE SAYS ABOUT THE ASSAULT?" Near the end of the presentation, the booking photo appeared three more times: first with the word "GUILTY" superimposed diagonally in red letters across [the defendant]'s battered face. In the second slide the word "GUILTY" was superimposed in red letters again in the opposite direction, forming an "X" shape across [the defendant's face. In the third slide, the word "GUILTY," again in red letters, was superimposed horizontally over the previously superimposed words.

*Glasmann,* 175 Wash.2d at 701–02, 286 P.3d 673 (internal citations omitted). Glasmann failed to object, just as Maddaus failed to object to here. *Glasmann,* 175 Wash.2d at 700, 702, 286 P.3d 673.

Nonetheless, on appeal, the Supreme Court held that the prosecutor's "including alterations of [the defendant]'s booking photograph by addition of highly inflammatory and prejudicial captions constituted flagrant and ill intentioned misconduct." *Glasmann,* 175 Wash.2d at 714, 286 P.3d 673. The Court further noted, "[S]howing Glasmann's battered face and superimposing red capital letters" added to the prejudice. *Glasmann,* 175 Wash.2d at 708, 286 P.3d 673 (citing *State v. Gregory,* 158 Wash.2d 759, 866–67, 147 P.3d 1201 (2006)). The Court believed there was a substantial likelihood that the misconduct affected the jury because "[t]he mental state required for the charged offenses, specifically intent, was critically important" and the nuanced distinctions posed a "serious danger that the nature and scope of the misconduct here may have affected the jury." *Glasmann,* 175 Wash.2d at 708, 710, 286 P.3d 673.

The circumstances in *Glasmann,* however, differed significantly from those here. Glasmann was charged with first degree assault, attempted first degree robbery, first degree kidnapping, and obstruction. *Glasmann,* 175 Wash.2d at 700, 286 P.3d 673. Glasmann did not deny culpability; rather, he disputed the degree of the crimes charged. *Glasmann,* 175 Wash.2d at 700, 286 P.3d 673. Maddaus was charged with first degree murder; but, in contrast with Glasmann, Maddaus adamantly denied culpability. Maddaus's theory of the case was that he did not commit the murder, not, like Glasmann, that he committed only a lesser degree of the charged crime.

Moreover, the center of the single slide included a photograph of Maddaus (not a mug shot, as in *Glasmann*) wearing a wig—to remind the jury that Maddaus had intentionally obtained a false passport and had been using a disguise on the days leading to his arrest. In contrast, nothing in the record here suggests that the State used this slide or any of the other altered slides to trigger "an emotional reaction" from the jury, as was the case in *Glasmann,* where multiple PowerPoint slides repeatedly displayed Glasmann's mug shot of him unkempt and bloody. *Glasmann,* 175 Wash.2d at 706, 286 P.3d 673 710 n.4. Instead, these slides contained descriptions of testimony or statements presented at the trial or statements that represented the State's argument based on reasonable inferences from the record.

Applying the heightened standard of scrutiny for unpreserved prosecutorial misconduct claims, we hold that Maddaus has failed to show that a curative instruction would not have overcome any prejudicial effect from the State's use of these slides. Moreover, as with the previous claim, defense counsel could have strategically elected not to object to these slides to avoid emphasizing them further; this point, coupled with Maddaus's failure to show prejudice, defeats his ineffective assistance claim on this basis.

Dkt. 77-1 at 22–23, Ex. 2 (record citations and footnotes omitted).

The State Court of Appeals, consistent with clearly established federal law, evaluated the State's closing argument in the context of the record as a whole and considered, among other things, whether the prosecutor's closing argument drew reasonable inferences from the record. Given its evaluation of the record, the state court reasonably concluded that (1) the prosecutor did not improperly disparage defense counsel and (2) the prosecutor's other comments and his use of PowerPoint slides—improper or not—did not affect the outcome of trial. Likewise, the state court reasonably concluded that trial counsel may have refrained from objecting during closing argument for strategic reasons and that, in any event, the failure to object did not cause substantial prejudice.

It is also important to note that, although Petitioner's attorney did not object to the State's closing argument, the jury was instructed that the attorneys' "remarks, statements, and

1    arguments" were not evidence and must be disregarded if not supported by the evidence or the

2    law. Dkt. 77-7 at 895, Ex. 120. Jurors are presumed to follow their instructions, *see Weeks v.*

3    *Angelone*, 528 U.S. 225, 234 (2000) (citing, *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)),

4    and nothing in the record before this Court suggests that they did not do so in this instance.

5         In sum, Petitioner has simply not demonstrated that the prosecutor's comments or the

6    PowerPoint slides, when viewed in context and in light of the argument as a whole, "so infected

7    the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*,

8    477 U.S. at 181. For similar reasons, he has not demonstrated the state court unreasonably

9    applied the *Strickland* standard when it rejected his ineffective assistance of counsel claims.

10        Urging a different result, Petitioner cites extensively to the State Supreme Court's

11   decision *In re Glasmann*, 175 Wash. 2d 696, 709–10, 286 P.3d 673, 680 (Wash. 2012). This

12   decision, which was discussed at length by the state court on direct appeal, concluded that a

13   prosecutor engaged in misconduct when he used PowerPoint slides labeling a defendant as

14   "GUILTY" during his closing argument. Dkt. 75 at 18–27; Dkt. 80 at 17–21.

15        The State Supreme Court's reasoning in *Glasmann* is not clearly established federal law

16   and it is not binding on this Court. It is also distinguishable on the facts. In rendering its decision,

17   the *Glasmann* court emphasized the importance of drawing fine lines between permissible and

18   impermissible closing argument where the jury's verdict will likely turn on nuances in the mental

19   state of the defendant:

20        The prosecutor's improper visual "shouts" of GUILTY urged the jury to find
21        Glasmann guilty as charged, and without them, the jury might have returned
         verdicts on the offenses Glasmann agreed he had committed. Because Glasmann
22        defended by asserting he was guilty only of lesser offenses, and nuanced
         distinctions often separate degrees of a crime, there is an especially serious danger
23        that the nature and scope of the misconduct here may have affected the jury.

24

1    *Id.* at 709–10; *see also id.* at 708 ("The mental state required for the charged offenses…was

2    critically important. Glasmann…defended on the basis that the facts only supported a guilty

3    verdict as to [lesser included offenses].").

4        Unlike the *Glasmann* defendant, Petitioner denied culpability outright, so his defense did

5    not involve the sort of nuanced distinctions that the *Glasmann* court found to be particularly

6    susceptible to prejudice. This same distinction was drawn by the State Court of Appeals in

7    denying Petitioner's direct appeal and it is no less cogent on federal habeas review. Thus,

8    Petitioner's reliance on *Glasmann* to demonstrate prejudice caused by the State's closing

9    argument does not save his claims in Grounds Four and Five.

10        Because Petitioner has not shown that the state courts' denial of his parallel prosecutorial

11    misconduct and ineffective assistance of counsel claims was contrary to, or an unreasonable

12    application of, clearly established federal law, or that it was based on an unreasonable

13    determination of the facts, Grounds Four and Five should be **DENIED**.

14        2.    Ground Six—Incomplete Record on Direct Appeal

15        In his sixth and final federal habeas claim, Petitioner argues the state court deprived him

16    of due process of law when it reviewed black and white photocopies of the prosecutor's

17    PowerPoint slides rather reviewing the slides in their original digital format. Petitioner presented

18    this claim in his PRP and in his correlating petition for discretionary review. Dkts. 77-2, Ex. 27.

19    In its decision declining discretionary review, the State Supreme Court found the claim

20    unavailing, reasoning that:

21        In his personal restraint petition, Mr. Maddaus asserts that the black and white
22        slides reviewed on direct appeal did not fairly represent their prejudicial effect
        because the prosecutor's slides were in color and used animation and audio. He also
23        moved for the Court of Appeals to order the State to produce an electronic copy of
        the presentation that would show the full effect of the slide presentation, and argues
24        that the court failed to act on his motion. But the court docket shows that the motion

was stricken or vacated.[4] And in any event, the Court of Appeals was fully capable of imagining the colors, animations, and sounds based on the descriptions provided.

Dkt. 77-3 at 4–5, Ex. 31 (citations omitted).

Petitioner's arguments in support of Ground Six are premised almost exclusively on *Glasmann*. Dkt. 80 at 21–22. He relies on following passage from that decision to support his claim that the State Court of Appeals was constitutionally required to review prosecutor's PowerPoint slides in full color and with original animations:

> "[V]isual arguments manipulate audiences by harnessing rapid unconscious or emotional reasoning processes and by exploiting the fact that we do not generally question the rapid conclusions we reach based on visually presented information." Lucille A. Jewel, *Through a Glass Darkly: Using Brain and Visual Rhetoric to Gain a Professional Perspective on Visual Advocacy*, 19 S. CAL. INTERDISC. L.J. 237, 289 (2010). Further,
>
> > [w]ith visual information, people believe what they see and will not step back and critically examine the conclusions they reach, unless they are explicitly motivated to do so. Thus, the alacrity by which we process and make decisions based on visual information conflicts with a bedrock principle of our legal system—that reasoned deliberation is necessary for a fair justice system.
>
> *Id.* at 293 (footnote omitted) (citing William J. Bowers, *Benjamin D. Steiner & Marla Sandys, Death Sentencing in Black and White: An Empirical Analysis of the Role of Jurors' Race and Jury Racial Composition*, 3 U. Pa. J. Const. L. 171, 261 (2001) (citing Jeffrey Ambramson, *We, The Jury: The Jury System and the Ideal of Democracy* (1994) (generally discussing the basic democratic principle for jury trials is that deliberations should be a rational and reasoned process))).

*Glasmann*, 175 Wash. 2d at 708–09. But this excerpt addresses the impact visual information can have on *jury deliberations*. It does not state, nor does it persuade, that an appellate court is required, as a matter of federal constitutional law, to review the original version of a visual aid

---

[4] Although the State Supreme Court noted that Petitioner's motion concerning the PowerPoint slides was stricken on direct appeal, the State Court of Appeals addressed the argument in its decision denying relief, noting that the slides were "arguably more dynamic in real time" but declining to consider whether the slides in the record were capable of accurately depicting the State's presentation, which was an issue it considered to be outside the record on direct appeal. Dkt.  at 33 fn. 39, Ex. 2.

1  challenged on direct appeal. Appellate judges are routinely required to imagine the proceedings

2  below based on the record and the descriptions provided by attorneys. And Petitioner offers no

3  compelling reason why the appellate panel in his case was unable to accurately assess prejudice

4  based on verbatim transcripts of the prosecutor's closing argument, black-and-white photocopies

5  of his PowerPoint slides, and additional descriptions provided by the attorneys.[5] Thus, the Court

6  finds that the state court reasonably concluded that the appellate panel was "fully capable of

7  imagining" the original slides based on the record before it on direct appeal. Dkt. 77-2 at 5, Ex.

8  31.

9         Accordingly, Petitioner has not shown that the state courts' denial of his final closing

10  argument claim was contrary to, or an unreasonable application of, clearly established federal

11  law, or that it was based on an unreasonable determination of the facts based on the evidence

12  before it. It is therefore recommended that Ground Six be **DENIED**.

13  **D.   Evidentiary Hearing**

14        Finally, Petitioner argues that, even if he has not demonstrated his entitlement to relief,

15  the Court should grant him an evidentiary hearing to further develop his claims. Dkt. 76. The

16  Court does not agree as Petitioner has not made the necessary showing for obtaining an

17  evidentiary hearing on his Second Amended Petition.

18

19  _____

[5] Petitioner's opening brief on direct appeal included the following description to accompany the photocopied slide

20  at issue here:

        [The prosecutor's] final slide displayed a photo of Mr. Maddaus in the center of the screen, wearing

21        a wig. A yellow circle circumscribed the photograph, and [the prosecutor] had superimposed the
        word "GUILTY" in red text over Mr. Maddaus's face. Eight white arrows pointed toward the yellow

22        circle around Mr. Maddaus and the word "GUILTY". Each arrow originated at a word or phrase
        (written in yellow) indicating a reason [the prosecutor] believed the evidence established Mr.
        Maddaus's guilt.  The record does not reflect how long this slide was shown, but it was the last slide

23        used in the state's closing argument.

24  Dkt. 77-1 at 578–79, Ex. 9 (record citations omitted).

The decision to hold an evidentiary hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the state court. *Cullen*, 563 U.S. at 181–82. A hearing is not required if the allegations would not entitle Petitioner to relief under § 2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*. Further, the Supreme Court in *Shinn* held that when reviewing a federal habeas petition under 28 U.S.C. § 2254, the federal court may not consider any facts beyond the factual record presented to the state post-conviction relief court unless one of the limited exceptions of 28 U.S.C. § 2254(e)(2) applies. *Shinn v. Ramirez*, 596 U.S. 366, 382 (2022).

Upon review, the undersigned finds it is not necessary to hold an evidentiary hearing in this case because, as discussed in this Report and Recommendation, Petitioner's claims for federal habeas relief may be resolved on the existing state court record, which refutes many of his factual allegations and otherwise precludes federal habeas relief. Thus, the undersigned recommends that Petitioner's request for an evidentiary hearing be **DENIED**.

### III.    CERTIFICATE OF APPEALABILITY

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of the federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the [petitioner] has made a substantial showing of the denial of a

constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Cockrell*, 537 U.S. at 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

No jurist of reason could disagree with this Court's evaluation of the Second Amended Petition or would conclude the issues presented therein should proceed further. Accordingly, the undersigned concludes Petitioner is not entitled to a certificate of appealability with respect to his Second Amended Petition.

## IV.     CONCLUSION

For the above stated reasons, Petitioner has not shown that the state courts' adjudication of any Ground raised in his Second Amended Petition was contrary to, or an unreasonable application of, clearly established federal law, or that the decision was based on an unreasonable determination of the facts in light of the evidence before it. Additionally, the undersigned finds that an evidentiary hearing is not necessary in this case and recommends that Petitioner's request for such a hearing be **DENIED**. Finally, the undersigned recommends the Second Amended Petition (Dkt. 76) be **DENIED**, that this action be **DISMISSED with prejudice**, and that a certificate of appealability not be issued.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda*

1   *v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time

2   limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **July 16,**

3   **2024**, as noted in the caption.

4        Dated this 1st day of July, 2024.

5

6

7        Grady J. Leupold
         United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24